UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| EDWARD HURST, )<br>)<br>Plaintiff, )<br>)<br>v )<br>)<br>)<br>CSX TRANSPORTATION, INC. )<br>)<br>Defendant. ) | Case No. 3:07-0195<br>Judge Echols |

**MEMORANDUM**

This is an action brought under the Federal Employer's Liability Act ("FELA") in which Plaintiff Edward Hurst ("Hurst") claims he was injured while operating a locomotive for his employer, Defendant CSX Transportation, Inc. ("CSXT"). Pending before the Court is a Motion for Summary Judgment (Docket Entry No. 55) filed by Defendant, to which Plaintiff has responded in opposition (Docket Entry No. 61), Defendant has replied (Docket Entry No. 66), and Plaintiff has filed a sur-reply (Docket Entry No. 73).

**I. FACTUAL BACKGROUND**

The Court sets forth the following basic facts underlying this litigation. These facts are construed as they must be for present purposes in Plaintiff's favor and will be expanded upon where necessary for purposes of the legal arguments presented by the parties.

On May 5, 2006, Plaintiff was the engineer on a CSXT freight train from Evansville, Indiana, to Nashville, Tennessee. The lead locomotive of the train engineered by Plaintiff was CSXT 5338 which had been placed into service on April 6, 2006.

1

The route between Evansville and Nashville is largely comprised of Class IV track. Under Federal Railway Act ("FRA") regulations, this means that freight trains are allowed to travel at 60 miles per hour. However, a small portion of the track around milepost 202.7 was deemed by CSXT to be Class III track, meaning that freight trains could travel over that portion of the track at 40 miles per hour. The 40 mile per hour designation around milepost 202.7 arose when John Sapp ("Sapp"), a FRA qualified track inspector employed by CSXT, placed a "slow order" on that portion of the track because he took measurements and found a two-inch "profile" or dip in the track.

Thereafter, another FRA qualified track inspector employed by CSXT, George Bray ("Bray"), inspected the stretch of track encompassing milepost 202.7 on three occasions between the date Sapp issued the slow order and May 5, 2006. In Bray's view, these inspections, which occurred on April 28, May 3, and May 4, 2006, presented nothing which would lead him to conclude that the track should be classified as being other than a Class III track.

Plaintiff claims that while engineering the train on May 5, 2006, locomotive CSXT 5338 hit two or three rough spots around milepost 202.7. Plaintiff contends that the train was going 40 miles per hour at the time but when it hit those spots, he bounced around a lot, both side-to-side and up and down. Plaintiff alleges that the jarring caused a herniated disc at the C5-C6 level, which ultimately required neck surgery.

After being jostled around, Plaintiff told his conductor, Michael Brown ("Brown") that he had discomfort in his back. However, Plaintiff did not stop the train, but instead proceeded on to Nashville. At the time, neither Plaintiff nor Brown reported the rough spot at milepost 202.7 or any type of defect with CSXT 5338 to CSXT's dispatcher, their supervisor, or any other CSXT officials. Nor was any report given to CSXT about any injury at that time.

2

Plaintiff and Brown spent the night in a motel in Nashville. The following morning, Plaintiff called Brown in his motel room and told him that he was still feeling pain and discomfort in his back from the day before. Plaintiff and Brown returned to Evansville on another train later that day and, during the trip, Plaintiff told Brown he was experiencing pain between his shoulder blades.

On May 7, 2006, Plaintiff was diagnosed during an emergency room visit with a herniated cervical disc at the C5-C6 level. On May 24, 2006, Dr. Mike W. Chou ("Dr. Chou"), a board certified neurosurgeon, operated on Plaintiff's neck at St. Mary's Medical Center. Plaintiff claims that despite the operation he is not able to return to work as a locomotive engineer for Defendant.

CSXT's rules require its employees to immediately report injuries. As indicated, Plaintiff failed to report the injury he alleges he suffered on May 5, 2006 on that date. However, Plaintiff claims that on May 8, 2006 he told Steve Utley ("Utley"), the chairman of the union, that he had suffered an injury on May 5, 2006. Utley in turn told Plaintiff that his injuries needed to be reported within 48 hours, otherwise Plaintiff was subject to being terminated.

On May 12, 2006, Bray again inspected the track encompassing milepost 202.7. His measurements revealed a profile of 1 7/8 inches on the West Rail and 1 3/4 inches on the East Rail. This was within the parameters for a Class IV track and meant that freight trains could travel over it at a speed of up to 60 miles per hour.

CSXT 5338 was inspected at CSXT's Waycross, Georgia facility on May 15, 2006. According to Defendant, this inspection revealed no defects in the locomotive's suspension system. However, records from the inspection indicate that a "lateral liner" on CSXT 5338 were "changed/repaired" at the Waycross facility on that date.

3

Based upon these events, Plaintiff filed suit in this Court, generally alleging that Defendant failed to exercise care in allowing him to operate a locomotive which was not safe upon a railway which was in need of repair or replacement. He alleges negligence under FELA, violation of the Locomotive Inspection Act under 49 U.S.C. § 20701 *et seq.*, and violation of federal regulations relating to the safety and maintenance of railroad tracks.

## II.  SUMMARY JUDGMENT STANDARDS

A party may obtain summary judgment if the evidence establishes there are not any genuine issues of material fact for trial and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Covington v. Knox County School Sys., 205 F.3d 912, 914 (6th Cir. 2000). The moving party bears the initial burden of satisfying the court that the standards of Rule 56 have been met. See Martin v. Kelley, 803 F.2d 236, 239 n.4 (6th Cir. 1986). The ultimate question to be addressed is whether there exists any genuine issue of material fact that is disputed. See Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986); Covington, 205 F.3d at 914 (citing Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)). If so, summary judgment is inappropriate.

To defeat a properly supported motion for summary judgment, the nonmoving party must set forth specific facts showing that there is a genuine issue of material fact for trial. If the party does not so respond, summary judgment will be entered if appropriate. Fed. R. Civ. P. 56(e). The nonmoving party's burden of providing specific facts demonstrating that there remains a genuine issue of material fact for trial is triggered once the moving party shows an absence of evidence to support the nonmoving party's case. Celotex, 477 U.S. at 325. A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. In ruling on a motion for summary judgment, the Court must construe the evidence

4

in the light most favorable to the nonmoving party, drawing all justifiable inferences in its favor. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

### III. LEGAL ANALYSIS

In relevant part, FELA provides:

> Every common carrier by railroad while engaging in commerce . . . shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce . . . for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, track, roadbed, works, boats, wharves, or other equipment.

45 U.S.C. § 51. To establish a claim under FELA, a plaintiff must show he was injured within the scope of his employment; his employment was in furtherance of his railroad employer's interstate transportation business; the railroad was negligent; and the railroad's negligence played some part in causing the injury for which plaintiff seeks compensation. Van Gorder v. Grand Trunk W. R.R., 509 F.3d 265, 269 (6th Cir. 2007).[1]

Because FELA contains a negligence component, a plaintiff must prove the traditional common law elements of negligence, including duty, breach, foreseeability and causation. Id. With regard to duty, the railroad's duty is to provide its employees with a reasonably safe workplace and

---

[1] As indicated previously, Plaintiff also brings claims under the Locomotive Inspection Act and other federal regulations pertaining to the operation of a railway. The Court will not consider these other claims separately since it determines that Plaintiff has established a jury question relating to FELA negligence.

For present purposes, it suffices to note that the Locomotive Inspection Act, while imposing an absolute duty on railroad carriers to insure their locomotives are safe, does not create a cause of action independent of FELA. Matson v. Burlington Northern Santa Fe R.R., 240 F.3d 1233, 1235 (10th Cir. 2001). Generally the Act requires that locomotives be safe and this "is no different from what the FELA would require by itself." Coffes v. Northeast Ill. Regional Commuter Railway Corp., 479 F.3d 472, 477 (7th Cir. 2007). Insofar as Plaintiff can establish the violation of a specific regulation, this would amount to a showing of negligence *per se* and the breach of a duty under FELA. Id.

5

to exercise reasonable care towards that end. Przbilnski v. CSX Transp. Inc., 2008 WL 4181191 at *3 (6th Cir. 2008). While FELA requires a showing of causation, the standard is relaxed with a plaintiff merely required to show that the railroad's negligence "'played any part, even the slightest, in producing the injury.'" Van Gorder, 509 F.3d at 269 (quoting, Rogers v. Missouri Pacific RR Co., 352 U.S. 500, 506 (1957)).

In this case, Defendant moves for summary judgment on the grounds Plaintiff can show no breach of duty inasmuch as he has been unable to identify any defect in the locomotive or track. Defendant also claims Plaintiff cannot show causation linking the May 5, 2006 train trip with his herniated cervical disc.

**A. Breach of Duty**

Defendant argues Plaintiff can point to no evidence which shows that locomotive CSXT 5338 was defective on May 5, 2006. However, to accept such an assertion, the Court would have to ignore the expert testimony presented by Plaintiff.

Thomas E. Johnson ("Johnson") is a licensed professional engineer who worked in the railroad industry for over 25 years, first as a Metallurgical Engineer and then as an Engineering Manager for GE Transportation Systems. He has submitted an expert report on behalf of Plaintiff in which he states that CSXT 5338 was in a defective and unsafe condition on May 5, 2006 because of its suspension problems, including its shocks, lateral liners, and wheel truings.[2] (Docket Entry No. 63-7 at 10).

---

[2]The record suggests that a lateral liner, also known as a pedestal liner, is a U-shaped wear plate made of fiber or similar material which prohibits excess lateral movement of the axle. The record further suggests that wheel truing relates to machining a wheel so as to eliminate flat spots.

6

Defendant makes various arguments to discount the impact of Johnson's report. For example, Defendant points to the Declaration of James E. Wright ("Wright"), one of its Locomotive Shop Managers, for the proposition that "Johnson is completely unfamiliar with CSXT's records and the suspension systems of locomotives." (Docket Entry No. 56 at 8). Maybe Wright is correct, but that is certainly not something which this Court can determine as a matter of law. Construing the evidence in a light most favorable to Plaintiff, Johnson has extensive experience in the railroad industry and whether Johnson understood the records before him is a question for the jury.

Defendant also argues that no jury question is presented on the issue of bad shocks or the wheel truings because Johnson's opinion relating to the former is based upon a December 4, 2006 record, while the later is based upon an August 31, 2006 report, neither of which would reveal the locomotive's condition on May 5, 2006.[3] While that may be true, it does not address the issue of a lateral liner which was allegedly replaced or repaired on May 15, 2006, approximately ten days after the incident at issue.

The Court uses the phrase "allegedly replaced or repaired" because Defendant maintains that a lateral liner was not replaced or repaired on May 15, 2006. Again, Defendant relies on Wright's Declaration in which he states that while CSXT 5338 was inspected at CSXT's Waycross, Georgia service facility on May 15, 2006, a lateral liner was not replaced. Further, Wright states that any replacement would have been done at the Waycross Locomotive Shop, which is a separate facility.

---

[3]Defendant also claims that the air shock issue is a red herring because the air shock repair was a repair to the conductor's seat, not the locomotive's suspension. Again Defendant relies upon Wright's Declaration in which he states that the December 4, 2006 report noting a "replaced air shock" referred to a replacement in the conductor's seat and that locomotives have hydraulic and not air shock suspension. (Docket Entry No. 58-3 at 2). However, this statement really does not resolve anything because Wright claims locomotives do not have air shocks, yet someone at CSXT noted that an air shock was replaced on CSXT 5338 on December 4, 2006.

7

Wright submits that any reference to a repair or replacement of a lateral liner was merely a way to code the inspection.

Contrary to Defendant's argument, Wright's assertions in his Declaration do not end the matter if for no other reason than CSXT's own records indicate that a lateral liner was "changed/repaired" on May 15, 2006. (Wright Decl. Ex. 3). Moreover, Daniel McNease ("McNease"), a machinist employed by CSXT since 1972, provided some testimony which supports Plaintiff's argument that a lateral liner was in fact replaced on that date. In his deposition, McNease testified that he inspected CSXT 5338 on May 15, 2006 although he does not recall the inspection. Upon reviewing the printout from that date at his deposition, McNease stated, "I see here they changed some of them lateral liners" and that according to the document "they changed the lateral liner." (McNease Depo. at 11, 13). McNease further stated that a repair or replacement of a lateral liner could have been done either at the Locomotive Shop or by a machinist sent over from the Locomotive Shop to the service facility. Thus, while Wright states in his declaration that no lateral liners were replaced on CSXT 5338 on May 15, 2006 and any such replacement would have to occur at the Locomotive Shop, those are facts which have been placed in dispute.

Apart from the issue of the condition of the locomotive on May 5, 2006, Defendant also argues that Plaintiff has failed to show any defect in the track around mile marker 202.7. Again, however, the record shows factual disputes which preclude summary judgment.

In support of the claim that it properly categorized the area of track around milepost 202.7 as a Class III track with a maximum speed of 40 miles per hour, Defendant relies primarily upon the testimony of Sapp and a Declaration from Bray. Sapp measured the track on April 25, 2006 and found it to have a 2" profile, while Bray inspected the same area of track on three occasions between

April 28, 2006 and May 4, 2006 and found no reason to classify the track as anything other than Class III track. While that may be so, Plaintiff has offered other evidence which either contradicts these conclusions or at least calls them into question.

According to evidence presented by Plaintiff, a profile or dip in the track is measured by stretching a 62' string along the rail in the area of the defect and taking a measurement. The measurement is made from the string to the rail and added to that is any space that may exist between the rail and the top of the tie plate (which sits atop the railroad tie and connects the rail to the tie), any space between the bottom of the tie plate and the tie, and the space between the bottom of the tie and the ballast which underlies the tie. Portions of Sapp's deposition can be read as suggesting that he properly measured the profile. However, other portions can be read as suggesting that the only measurement Sapp took was from the bottom of the string to the top of the rail. (See, Sapp Depo. at 22). Moreover, Sapp stated that measurements are supposed to be taken under load, which Sapp stated "would be, like, if a train was going over it [the track]." (Sapp Depo. at 23). However, when Sapp took the measurement there was only a 10,000 pound truck on the track, which is about 27 times lighter than a locomotive which weighs approximately 270,000 pounds. (Id.) Thus, there is a question as to whether Sapp's measurement of the profile or defect on April 25, 2006 was accurate.

Bray's Declaration does not definitively resolve the issue of the track profile either. After Sapp issued his slow order, Bray inspected the track on three occasions, the last of which was the day before the incident at issue in this lawsuit. However, the record suggests that he did not take any measurements on those dates, but instead road his rail truck over the area and determined that the track did not need to be further downgraded.

9

The issue of the profile in the track is further called into question by the expert report of Raymond A. Duffany ("Duffany") who states that he has more than thirty years of professional railway engineering experience through employment with three "Class 1" railroads and as a railway-engineering consultant. Based upon his review of the evidence in this case, including the deposition testimony of Bray and Sapp and Bray's notes, Duffany concludes that the rail was not properly measured by either Bray or Sapp. He further opines that the mud which was observed by both Sapp and Bray under the ballast around milepost 202.7 would have affected the stability of the track structure, but that problem was not addressed by CSXT.

In sum, factual issues exist not only with respect to the safety of the track at milepost 202.7 on May 5, 2006, but also with respect to the condition of CSXT 5338 on that date. Thus, summary judgment on the issue of breach of duty is unwarranted.

**B. Causation**

Defendant also moves for summary judgment on the ground that Plaintiff has presented no proof that his alleged injuries were caused by the trip on May 5, 2006. In this vein, Defendant asserts in its reply brief that Plaintiff has failed to identify an expert witness who will testify that his herniated cervical disc was caused by the events of that day and the time for naming such experts has long passed.

While Plaintiff may not have designated an expert in his disclosures, he did identify Dr. Judi Ann Brezausek, his family physician, and Dr. Choi, among others as individuals who may be called as witnesses at trial pursuant to Fed. R. Civ. P. 26(a)(2)(A) . (Docket Entry No. 63-9). Plaintiff further indicated in his disclosures that those doctors could be "called to testify with respect to the cause, nature, duration, and extent of the plaintiff's injuries as well as the diagnosis, prognosis and

10

pain and suffering associated with said injuries[.]" (Id. at 2). Both doctors have been deposed in this action.

In Fielden v. CSX Transp., Inc., 482 F.3d 866 (6th Cir. 2007), the Sixth Circuit was presented with a FELA case where summary judgment was granted in favor of the railroad because plaintiff did not file an expert report from his treating physician. The Sixth Circuit held that the treating physician could testify on the issue of causation (to wit, he believed that his patient's extensive use of a "plate jack" at work caused the patient's carpal tunnel syndrome), notwithstanding the absence of such a report. In doing so, the Sixth Circuit observed Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure requires a party "to file an expert report from a treating physician only if that physician was "retained or specially employed to provide expert testimony.'" Id. at 869 (quoting Fed. R. Civ. P. 26(a)(2)(B)). The Sixth Circuit went on to observe "[t]his conclusion is supported by the obvious fact that doctors may need to determine the cause of an injury in order to treat it" and that "[d]etermining causation may . . . be an integral part of 'treating' a patient." Id. at 870.

In this case, there is no evidence that either Dr. Brezausek or Dr. Chou was retained by Plaintiff for this litigation. Therefore, they can testify on the issue of causation without the need for filing an expert report.

In both of their depositions, Dr. Brezausek and Dr. Chou provided some evidence to support the notion that Plaintiff's herniated disc at C5-C6 resulted from the train ride on May 5, 2006. Specifically, Dr. Brezausek testified:

> Q. Doctor, do you have an opinion as to whether or not there's a causal relationship between the incident of May 5th, 2006, where Mr. Hurst related to you that he was working for the railroad as an engineer and was bounced around in the engine and the subsequent MRI that was performed two days later on May 7th that noted a herniated disc at the C5-C6 level?

11

>           A. Yeah. I would believe that the incident on the railroad directly related
> to that because he had fully recovered from his prior cervical spine
> surgery. He had full strength before then, and it was only after that
> that he developed his problems with his -- the cervical disc on the left
> side.

(Brezausek Depo. at 34-35). In his deposition, Dr. Chou testified as follows:

> Q. Do you have an opinion, Doctor, as to whether or not the incident of May 5th, 2006, has a causal relationship to the findings of the May 7, 2006, MRI and the subsequent surgery that you performed on May 24th, 2006, which revealed the presence of a herniated disc?
>
>           [COUNSEL FOR CSXT]: Object to form.
>
> A. Well, it does make sense there, you know, to have a traumatic episode and then to have pain that follows it and the pain is due to the herniated disc which gets better with surgery, so, I mean, it all – it all kind of fits together nicely there.

(Chou Depo. at 20). Later, in response to questions presented by counsel for CSXT, Dr. Chou admitted that a history of disc herniation and degenerative disc disease could lead to additional herniated discs, but also observed that "[u]sually there's some sort of trauma." (Id. at 23).

When Drs. Brezausek's and Chou's testimony is read in conjunction with the other evidence in the record, Plaintiff has presented a jury issue on the question of causation. Plaintiff himself has indicated that he was thrown about and injured on May 5, 2006 when he engineered the locomotive around milepost 202.7. In a report just days after the incident, Brown, his conductor, indicated that when the train traveled over the subject track, it hit three dips. After hitting the first dip, the train was "airborne" and their "butts rose from the seat." Less than a second later, the train hit a second dip which created a "violent stop" to Plaintiff's and Brown's downward motion. Brown then told Plaintiff that he could not believe the track was rated for 40 miles per hour and Plaintiff immediately complained of pain in his back. Brown further indicates that Plaintiff called him in his room the next morning and complained of pain. Plaintiff also complained to Brown on the trip back to

12

Evansville. (Docket Entry No. 58-1 at 6-7). The following day, Plaintiff went to the emergency room where he was found to have a ruptured disc.

Given this evidence, a reasonable jury could conclude that the rough track around mile post 202.7 led to Plaintiff's injury, particularly since "[a] 'relaxed' standard of causation applies in FELA cases." Fielden, 482 F.3d at 872. As such, Defendant is not entitled to summary judgment on the issue of causation.

## IV. CONCLUSION

On the basis of the foregoing, Defendant's Motion for Summary Judgment (Docket Entry No. 55) will be denied.

An appropriate Order will be entered.

_____
ROBERT L. ECHOLS
UNITED STATES DISTRICT JUDGE